UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KISHA S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 1:17-cv-02397-DML-SEB |
| | ) |
| NANCY A. BERRYHILL, Deputy | ) |
| Commissioner for Operations, Social | ) |
| Security Administration,[2] | ) |
| | ) |
| Defendant. | ) |

## Order on Complaint for Judicial Review

Plaintiff Kisha S. applied for disability insurance benefits ("DIB") on May 22, 2014, and supplemental security income ("SSI") on June 3, 2014, from the Social Security Administration ("SSA"), alleging an onset date of November 30, 2013. [Tr. 10.] Her applications were initially denied on July 29, 2014, [Tr. 105], and upon reconsideration on October 6, 2014, [Tr. 125]. Administrative Law Judge Gladys

---

[1] In an attempt to protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

[2] It has come to the Court's attention that on March 6, 2018, the General Counsel of the U.S. Government Accountability Office ("GAO") notified the President that effective November 17, 2017, Nancy A. Berryhill could no longer serve as the "Acting Commissioner" of the Social Security Administration pursuant to the Federal Vacancies Reform Act of 1998, Pub.L.No. 105-277, Div. C, Title I, 112 Stat. 2681-611 (Oct. 21, 1998), as amended, 5 U.S.C. §§ 3345-3349d. GAO, https://www.gao.gov/products/D18772#mt=e-report (last visited Apr. 27, 2018). The case caption has been updated to reflect Ms. Berryhill's current official title.

1

Whitfield (the "ALJ") held a hearing on May 12, 2016. [Tr. 42-71.] The ALJ issued a decision on June 27, 2016, concluding that Kisha S. was not entitled to receive DIB or SSI. [Tr. 7.] The Appeals Council denied review on May 11, 2017. [Tr. 1.] On July 14, 2017, Kisha S. timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). [Filing No. 1.]

# I.
## STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits … to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second, it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last … not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539

2

F.3d 668, 678 (7th Cir. 2008), this Court must accord the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Deputy Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original).[3] "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a

---

[3] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, the citations in this opinion refer to the appropriate parallel provisions as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

3

line of evidence contrary to the ruling." *Id*. The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(iv), (v). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Deputy Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id*. (citation omitted).

## II.
### BACKGROUND

Kisha S. was 25 years of age on her alleged onset date. [Tr. 204.] She has a limited education and previously worked as a cashier, cook, and cosmetology apprentice. [Tr. 20.][4]

---

[4] The relevant evidence of record is amply set forth in the parties' briefs, as well as the ALJ's decision and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

4

The ALJ followed the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Kisha S. was not disabled. [Tr. 26.] The ALJ found as follows:

- At Step One, she had not engaged in substantial gainful activity[5] since November 30, 2013, the alleged onset date. [Tr. 12.]

- At Step Two, she had the following severe impairments: "obesity, rheumatoid arthritis, diabetes with neuropathy, and polyarthralgia of small joints of hands and elbows with morning stiffness." [Tr. 12 (citations omitted).]

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Tr. 14.]

- After Step Three but before Step Four, she had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift and carry 10 pounds occasionally; stand and walk for 2 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; no driving; frequently reach overhead, to the side, and forward with the bilateral upper extremities; frequently handle and finger; avoid concentrated exposure to unprotected heights and dangerous moving machinery; and be absent from work one day per month." [Tr. 15.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Kisha S.'s RFC, she was incapable of performing any of her past relevant work. [Tr. 20.]

- At Step Five, relying on VE testimony and considering her age, education, and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed through the date of the decision. [Tr. 21.]

---

[5] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

# III.
## DISCUSSION

Kisha S. presents a single issue on appeal, arguing that the ALJ's RFC determination is not supported by substantial evidence because the ALJ erred in weighing and evaluating two treating physicians' opinions. The Court will address each medical source statement in turn.

### A. The ALJ gave good reasons for discounting the opinions of Dr. Nunez-Estrada.

Kisha S. asserts that the ALJ impermissibly dismissed the March 16, 2016 medical source statement of her treating primary care physician, Dr. Nunez-Estrada, which included opinions that Kisha S. requires limitations greater than those the ALJ incorporated into her RFC. [Filing No. 17 at p. 11] In particular, Dr. Nunez-Estrada assessed that Kisha S. (1) has constant interference with attention and concentration required to perform simple work-related tasks, (2) needs to lie down, recline, or otherwise take unscheduled breaks in excess of typical tolerances during an eight-hour workday, (3) can use her upper extremities only between thirty and forty percent of the workday for specific manipulative functions, and (4) needs to miss more than four days of work per month. [Tr. 542-43.]

Kisha S. argues that the ALJ, in discounting these opinions, failed to follow the deferential treating physician rule or consider the regulatory factors used to evaluate opinion evidence, [Filing No. 17 at p. 11], noting that Dr. Nunez-Estrada had treated her at least seven times before rendering an opinion, [*Id.* at 13]. She also argues that the ALJ mischaracterized the physical examinations of record as

6

"benign," [*Id.* at 12 (citing Tr. 20)], and erred in rejecting Dr. Nunez-Estrada's opinion that Listing 14.09 was met, because evidence supported Kisha S.'s inability to ambulate effectively or inability to perform fine and gross movements, either of which satisfies Listing 14.09, [*Id.* at 13.]

Based on the filing date of Kisha S.'s applications, the treating physician rule applies. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies only to claims filed before March 27, 2017). In *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(c)(2)), the Seventh Circuit held that a "treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott*, 647 F.3d at 739 (citing *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306). "And even if there had been sound reasons for refusing to give [a treating physician's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit." *Id.* at 740 (*See Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Id.* (*See Moss v. Astrue*,

7

555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c)). However, so long as the ALJ "minimally articulates" her reasoning for discounting a treating source opinion, the Court must uphold the determination. *See Elder v. Astrue,* 529 F.3d 408, 415–16 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527).

1. The ALJ's conclusion that Dr. Nunez-Estrada's opinions were inconsistent with Kisha S.'s activities of daily living was sound.

The ALJ gave Dr. Nunez-Estrada's March 16, 2016 opinion "little weight," explaining first that Dr. Nunez-Estrada's opinion that Kisha S. is unable to sustain the demands of regular and continuous work was inconsistent with Kisha S.'s ability to perform activities of daily living. [Tr. 20.] The regulations do instruct the ALJ to consider "consistency" with "the record as whole" when determining the weight that should be given a medical opinion. 20 C.F.R § 404.1527(c)(4). A determination of the need for breaks and absences primarily involves an evaluation of subjective symptoms difficult to assess objectively (at least absent a prolonged functional capacity assessment). Notably, the regulations instruct the ALJ to consider the claimant's activities of daily living when evaluating the claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3)(i). Furthermore, the Seventh Circuit has held that it may be proper to extend that analysis to an evaluation of the opinion evidence. *See Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988) (Despite evidence of pain, the ALJ was permitted to discount a treating source opinion that was "not completely consistent with plaintiff's normal activities.").

8

Although the ALJ did not detail the inconsistency between Dr. Nunez-Estrada's opinion and Kisha S.'s activities daily of living, her analysis of Dr. Nunez-Estrada's opinions followed a detailed analysis of Kisha S.'s RFC and subjective symptoms. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole, and . . . it would be needless formality to have the ALJ repeat substantially similar factual analyses" throughout the decision). Earlier in the decision, the ALJ concluded that Kisha S.'s activities of daily living were "not significantly compromised by her medical comorbidities." [Tr. 19.] Kisha S. testified that she cooked for herself and her children on weekends and four days a week, [Tr. 53-54], she straightened up around the house, went to the neighbors' to do laundry two or three times a week, [Tr. 54], and went grocery shopping at least once a month, which could take her an hour in the store, [Tr. 55]. The ALJ also noted that Kisha S. cared for two small children, assisted in getting them ready for school, helped with homework, used public transportation, and went to the library. [Tr. 19.]

The Court has considered Kisha S.'s argument that the ALJ improperly equated the performance of activities of daily living with meeting the demands of full-time work. [Filing No. 17 at p. 12 (citing *Clifford*, 227 F.3d at 872; *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer.

The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.")).] The Seventh Circuit has also held that the ability to care for two young children did not conflict with the inability to work full-time where the mother was able to take frequent breaks and get assistance from family members. *Gentle v. Barnhart*, 430 F.3d 865, 867-868 (7th Cir. 2005).

However, in *Clifford*, *Bjornson*, and *Gentle*, the Seventh Circuit highlighted important limitations in the claimant's activities of daily living that were ignored by the ALJ. *See Clifford*, 227 F.3d at 872 ("For example, Clifford testified that her typical household chores took her only about two hours to complete. Clifford indicated that she had to rest while doing household chores. She stated that she cooks, but only simple meals. She also indicated that she could vacuum, but it hurts her back. She stated that she goes grocery shopping about three times a month and 'sometimes' carries groceries from the car to the apartment. She further stated that she could lift a twenty pound sack of potatoes, but she 'wouldn't carry it long.' Clifford testified that her husband helps her with the household chores whenever possible."); *Bjornson*, 671 F.3d at 647 (claimant "can get help from other persons (in this case, Bjornson's husband and other family members)"); *Gentle*, 430 F.3d at 867 ("she performs these chores with difficulty, and with the aid of her sister, a neighbor, and another woman").

In contrast, Kisha S.'s did not testify that she required any additional assistance from others to manage her household. There is also little indication that

she either needed to take breaks to get the activities completed or made special arrangements to spread out these tasks. The activities themselves are also inconsistent with some of her specific complaints. For example, there was no testimony that her activities were limited by the inability to use her hands for prolonged periods, carry even modest weight over five pounds, or concentrate enough to complete simple tasks. The ALJ's treatment of the evidence concerning Kisha S.'s activities of daily living did not ignore important qualifications involving their performance.

Moreover, the ALJ noted that Kisha S.'s own testimony seemed to undermine some of her specific complaints about her ability to sustain exertional activity, which would be relevant to an extent to the alleged need for breaks. [Tr. 15-16.] While she maintained that prolonged sitting, standing, and walking caused pain, she also testified that she could stand for two hours in a response to a question that asked her capacity "before you start to have problems." [Tr. 57.] She further testified that she can sit even longer, for three hours at time, despite her leg swelling problem. [Tr. 58.] In the context of this testimony, it is difficult to see how she would not be able to perform sedentary work.

2. <u>The ALJ did not err in finding that Dr. Nunez-Estrada's opinions were inconsistent with her own treatment records.</u>

The second specific reason that the ALJ gave for discounting Dr. Nunez-Estrada's assessment was that the limitations she had assessed were inconsistent with the doctor's own treatment notes, which "do not reflect neurological deficits, motor limitation, or significant manipulative impairment. Indeed, she records some

decreased range of motion in several joints and some persistent swelling, but essentially her physical examinations have been benign." [Tr. 20.] Kisha S. argues that the ALJ mischaracterized the record and cannot pick and choose only the evidence that favors her decision or ignore a line of evidence that is contrary to her findings, [Filing No. 17 at p. 10, 12], but Kisha S. has not identified any evidence of record that the ALJ did not consider in her decision, nor does she cite any record evidence of neurological deficits or significant manipulative impairment. Kisha S. argues that the ALJ overlooked evidence in Dr. Nunez-Estrada's treatment records of x-ray imaging of her left foot, [Filing No. 17 at 12 (citing Tr. 322)], but that was discussed by the ALJ, [Tr. 16]. She cites to an examination completed by Dr. Nunez-Estrada that indicated swelling, crepitus, pain with flexion, and a limp. [Filing No. 17 at 12 (citing Tr. 458-59).] The ALJ reviewed the specific examination and detailed those findings. [Tr. 17 (citing Tr. 408-09 (a duplicate of the September 9, 2014 examination at Tr. 458-59)).] Kisha S. also cites to the results of a consultative examination with a different provider indicating effusion and reduced range of motion. [Filing No. 17 at 12 (citing Tr. 330).] Although the ALJ did not specifically mention those findings, the ALJ explicitly credited evidence in the records of reduced range of motion and swelling. Moreover, the ALJ that the same independent consultative examination had revealed Kisha S. to be neurologically intact, with intact grip strength in the bilateral hands, and normal manipulative abilities. [Tr. 16 (citing Tr. 328-32).]

As the Deputy Commissioner correctly points out, the ALJ did not simply conclude without elaboration that the physical examinations were benign. [Filing No. 22 at 10.] The ALJ confronted the conflicting evidence of record. Notably, the record of the last treatment visit with Dr. Nunez-Estrada before the opinion indicated occasional foot pain, "shooting pain and not daily and no pain today," while the examination of her knees and hands showed "no swelling, no deformity." [Tr. 442-43.] To determine whether substantial evidence exists, the Court reviews the record as a whole but is not allowed to substitute its judgment for the ALJ's "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999) (internal quotations omitted). Accordingly, the Court declines any implied invitation to reweigh the conflicting evidence of record in the ALJ's evaluation of Dr. Nunez-Estrada's opinion.

The Court also does not agree with Kisha S. that the ALJ failed to provide a logical bridge from the evidence to her conclusions concerning the RFC generally or in contrast to the discounted opinions of record specifically. [Filing No. 17 at 8.] The Court agrees with the Deputy Commissioner that the ALJ's RFC conclusions were adequately supported under the deferential governing standard of review. [Filing No. 22 at 10 (citing *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015).] Here, the ALJ credited increased pain and swelling with prolonged standing and walking by reducing the exertional level in the RFC to sedentary work. [Tr. 17.] In doing so, the ALJ discounted the state agency consultant opinion that Kisha S. is capable

13

of light work, reasoning that "[i]n light of the newly submitted evidence, the undersigned no longer finds light work consistent with the record as a whole." [Tr. 19.] The ALJ accommodated decreased range of motion in the elbows and knees and the effects of obesity by adding some manipulative and postural limitations. [Tr. 17-18.] The ALJ partially credited subjective complaints of pain and fatigue by allowing one absence per month for "unbearable flares when access to medical care is not readily available." [Tr. 18.] However, the ALJ rejected more restrictive limitations with lifting and carrying based on the most recent examination revealing full muscle strength in the upper extremities, [Tr. 17], and she rejected the need for Kisha S. to elevate her legs every three to four days based on the lack of any supporting opinion, [Tr. 18].

In reaching her conclusions, the ALJ detailed Kisha S.'s treatment for her autoimmune condition, rheumatoid arthritis, including her treatment with appropriate specialists (two rheumatologists over the period at issue). [Tr. 16-17.] The ALJ noted that Kisha S. was prescribed an oral steroid, immunosuppressant, intraarticular injections, low-dose narcotic for breakthrough pain, and eventually a biological agent. [Tr. 17-18.] The ALJ further documented clinical indications of active disease, including enlargement of fingers, hyperpigmentation, some limping, prominent genu valgus, crepitus in the knees, synovitis in the elbows, wrists, hands, fingers, knees, and ankles, and decreased range of motion. [Tr. 16-17.] However, the ALJ noted a lack of treatment at times and insurance difficulties that prevented compliance with a prescribed medication regimen. [Tr. 17.] "Notably, once the

claimant started taking prescribed medications, her symptoms decreased and her laboratory numbers improved. The claimant had sustained joint pain in the feet and ankles, but elbows were much improved from [a] prior injection and her strength was full in all four extremities (Ex. 7F at 9)." [Tr. 17 (citing Tr. 351-52 (On February 16, 2016, rheumatology treatment notes indicated improved laboratory findings (within normal limits) checking for signs of active disease and generalized inflammation, her main ongoing complaints were joint pain in her feet and ankles with morning stiffness, she had a "very good clinical response" with elbow injections, and "based on clinical response" the provider planned to reduce her medications, starting with her Methotrexate)).] Furthermore, the ALJ noted testimony that injections provided one and half months of relief. [Tr. 18; *see* Tr. 62-63 (Kisha S. testified swelling in elbows occurs "sometimes just one [time] a month, that's why I get the injection," and denied pain after the injections, "No. It's like after they inject it, I feel fine.").] The ALJ appropriately considered Kisha S.'s positive response to treatment in assessing the severity of her functional limitations. *See Stepp*, 795 F.3d at 720-21.

Accordingly, when considering the reasons specifically provided by the ALJ in discussing Dr. Nunex-Estrada's opinion, as well as the evidence considered elsewhere in the decision and detailed above, the Court finds that there was substantial evidence inconsistent with Dr. Nunez-Estrada's opinions that justifies the ALJ's refusal to give them controlling weight. The Court further finds that the ALJ gave good reasons for that refusal.

3. <u>The ALJ did not err in rejecting Dr. Nunez-Estrada's opinion that Kisha S. satisfies Listing 14.09.</u>

Similarly, the Court finds substantial support for the ALJ's determination that no weight should be given to Dr. Nunez-Estrada's conclusory opinion that the requirements of Listing 14.09 were met. [Tr. 20.] Dr. Nunez-Estrada filled out a check-the-box form indicating that Kisha S.'s inflammatory arthritis met the criteria for Listing 14.09 with "[p]ersistent inflammation or persistent deformity" of both "[o]ne or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively" and "one or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively." [Tr. 342.] Kisha S. provides very little argument that the listing is met based on the evidence, citing only to objective diagnostic evidence and clinical findings, which the ALJ did consider in her decision. [Filing No. 17 at 13.]

Moreover, in order to satisfy the listing, the impairment must also result in significant functional limitations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 14.00(D)(6)(e)(i) (the listing is "shown by an impairment that results in an 'extreme' (very serious) limitation"). The regulatory definitions of an "inability to ambulate effectively" and an "inability to perform fine and gross movements effectively" are not extremely clear, but they include examples such as needing to use an ambulatory aid in each arm to stand and walk, or being precluded from accomplishing activities of daily living like shopping or preparing a simple meal because of problems walking or using the upper extremities. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 14.00(C)(6)-(7); *see also See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

16

1.00(B)(2)(b)-(c). Considering the totality of the evidence, including most notably the evidence concerning Kisha S.'s activities of daily living discussed above, the Court concludes that the required degree of functional limitation was not credibly established.

### B. The ALJ gave good reasons for discounting Dr. Aroutiounova's opinion.

Kisha S. further argues that the ALJ improperly rejected the opinion of her treating specialist, a rheumatologist, Dr. Aroutiounova. That opinion includes limitations greater than those the ALJ adopted in her RFC: that Kisha S. would need to change positions at will, could not stand or walk for more than fifteen minutes at a time, would need unscheduled breaks and absences each month in excess of competitive tolerances, could only use her hands and arms fifty percent of the day, and could never use her fingers. [Filing No. 17 at p. 13-14 (citing Tr. 339-40).]

The ALJ gave Dr. Aroutiounova's opinion "little weight," despite acknowledging the treating and examining relationship between the provider and Kisha S., as well as the provider's applicable specialty. [Tr. 19-20.] However, the ALJ found the "limitations excessive and unsupported by the totality of the evidence." [Tr. 19-20.] Generally, "[m]ore weight is given to the opinion of a treating physician because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Clifford*, 227 F.3d at 870); *see* 20 C.F.R. § 404.1527(c)(2)(i)-(ii). But as the Seventh Circuit has also pointed out, it "would be exceedingly illogical to credit

a doctor's opinion because [she] is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail*[ed] *or longitudinal view*." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis in original). That is the case here. As in *Scheck*, the ALJ properly discounted Dr. Aroutiounova's opinion because the treatment relationship with Kisha S. consisted of only four visits in an eight-month period, the first two visits occurring before she had been prescribed biological medication, and the subsequent visits showing the benefits of treatment. [Tr. 20.] Dr. Aroutiounova noted at Kisha S.'s last visit—after the opinion had been given—that "both elbows are tender, but not as swollen" after receiving injections. [Tr. 530.] Furthermore, when Kisha S. started treating with a subsequent rheumatologist and was able to maintain compliance with her medication regimen, the evidence does suggest improvement. [Tr. 351-52.] Accordingly, the Court finds that the ALJ gave good reasons for discounting the specialist's opinion in light of the updated evidence providing a more detailed and longitudinal picture of Kisha S.'s response to treatment.

Finally, the Court is cognizant of Kisha S.'s argument that the two discounted treating opinions are substantially consistent with one another, which certainly could bolster their overall credibility. However, the final determination of the RFC finding is "reserved" to the Deputy Commissioner. 20 C.F.R. § 404.1527(d)(2); *see Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (citing *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 ("That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the

responsibility of resolving the conflict.")). The ALJ was entitled to find that neither Dr. Nunez-Estrada's or Dr. Aroutiounova's opinion was consistent from a longitudinal perspective with the substantial evidence of record showing a good response to treatment, albeit with some delay in finding and implementing a proper treatment regimen.

## IV.
### Conclusion

For the reasons detailed in this order, the Court finds no legal basis to reverse the ALJ's decision that Kisha S. was not disabled during the relevant time. Therefore, the decision below is **AFFIRMED**. Final Judgment will issue accordingly.

So ORDERED.

Date: 9/19/2018

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov

Edward A. Wicklund
OLINSKY LAW GROUP
twicklund@windisability.com